**UNIVERSAL LITE DISTRIBUTORS, INC., Plaintiff,**

v.

**NORTHWEST INDUSTRIES, INC. and Universal Manufacturing Corporation, Defendants.**

**Civ. No. H–75–219.**

United States District Court, D. Maryland.

June 2, 1978.

---

H. Robert Halper, Terence P. Boyle and O'Connor & Hannan, Washington, D. C., and Andrew Jay Graham and Kramon & Graham, Baltimore, Md., for plaintiff.

J. Alan Galbraith, William E. McDaniels and Williams & Connolly, Washington, D. C., and James E. Carbine and Weinberg & Green, Baltimore, Md., for defendants.

ALEXANDER HARVEY, II, District Judge:

In this civil action, a distributor of fluorescent lamp ballasts has sued a manufacturer of that product and its parent. The dispute here arises out of a longstanding agreement between the parties which was never reduced to writing. Each side has charged the other with a breach of this oral agreement, and the plaintiff has further charged the defendants with various violations of federal and state antitrust and unfair competition laws.

Plaintiff, Universal Lite Distributors, Inc. (hereinafter "ULD") has for many years purchased ballasts[1] from Universal Manufacturing Corporation (hereinafter "UMC"). Both UMC and its parent, Northwest Industries, Inc. (hereinafter "Northwest"), have been named as defendants in this action. The dispute here arose because of conflicting interpretations given by the parties to a 1947 oral agreement between UMC and an affiliate of ULD, Mobern Electrical Supply Company (hereinafter "Mobern").[2] Under that agreement, Mobern became the exclusive distributor of UMC ballasts in Maryland, the District of Columbia, Virginia, North Carolina and South Carolina (hereinafter "the five state area"). Mobern was and is controlled by the family of one Hyman Bernstein, and in 1957 ULD was formed as a separate corporation, with the stock likewise being similarly owned by the Bernstein family. ULD then assumed Mobern's rights and obligations under the oral agreement as the exclusive distributor of UMC ballasts in the five state area. Mobern in turn purchased ballasts from ULD and undertook the business of assembling and selling light fixtures.

In the late 1960's, following the death of Archie Sergy, then President of UMC and the man who had entered into the oral agreement with Mobern in 1947, the business relationship between ULD and UMC began to deteriorate. In the early 1970's, various meetings were held from time to time between representatives of the parties and their attorneys. Attempts to patch up the parties' differences proved unsuccessful; instead, the exchanges became even more heated and bitter. Recognizing that it would be put out of business if UMC stopped selling it ballasts under the oral agreement, ULD resorted to litigation to resolve the dispute, filing this civil action in this Court on February 25, 1975.

In its four-Count complaint, ULD alleges in Count I a conspiracy between defendants and certain unnamed co-conspirators to restrain trade and to monopolize the ballast industry in violation of the Sherman Act, 15 U.S.C. § 1 et seq. In Count II, plaintiff alleges unlawful price discrimination in violation of the Robinson-Patman Act, 15 U.S.C. § 13. In Count III, ULD seeks recovery under a theory of breach of contract by defendants UMC and Northwest; and in Count IV, unfair competition under Maryland law is alleged. As relief, ULD seeks a preliminary and permanent injunction which would require continued sales of ballasts by UMC to ULD, together with damages for breach of contract and unfair competition. ULD also claims treble damages and attorney's fees under its antitrust claims.

UMC has filed an answer and a counterclaim seeking damages and declaratory relief. In its five-Count amended counterclaim, UMC asserts in Count I that ULD failed to pay sums due for improper deductions, as agreed on November 22, 1974. Count II seeks recovery for ULD's failure to make proper payment for shipments "Paul No. 1" and "Paul No. 2", placed December 18, 1974. In Count III, recovery is

---

1. According to UMC's 1976 catalog, a ballast is a current and voltage regulating device which (a) transforms line voltage to the proper open circuit voltage necessary for the particular lamp it will operate; (b) provides a specific amount of electrical energy to preheat lamp electrodes either temporarily as in a starter-type lamp or permanently as in a Rapid Start lamp; (c) supplies a controlled surge of high voltage to initiate the arc throughout a starter-type lamp; and (d) controls lamp current by reducing open circuit voltage to safe operating voltage within the limits prescribed by the lamp manufacturer.

2. Mobern is not a party to this suit.

sought for ULD's failure to pay for UMC goods at the price set by UMC at the time of shipment. Count IV seeks a declaratory judgment that UMC has the immediate right to terminate for cause the distributorship. In Count V, UMC alternatively asks for a declaratory judgment that it may terminate ULD's distributorship upon reasonable notice.

Following the filing of this suit in February 1975, UMC ceased all ballast shipments to ULD. Pursuant to a stipulation between the parties approved by the Court, UMC later resumed shipments to ULD pending the outcome of this litigation. On December 8, 1977, UMC filed a motion to be relieved of this stipulation, so that shipments thereunder might cease.[3] Previously, on March 18, 1977, UMC had formally notified ULD that ULD would cease to be UMC's distributor upon the termination of this litigation.

In the three years that have elapsed since the complaint was filed, the parties have engaged in extensive discovery. The bitterness between the parties has carried over into this litigation, and this Court has been required on numerous occasions to rule on discovery and other disputes, which under other circumstances might reasonably have been expected to have been resolved by the parties themselves.

Presently pending before this Court is a motion filed by defendant UMC seeking summary judgment in its favor on all Counts of the complaint and on all Counts of the counterclaim. Voluminous briefs[4] and hundreds of supporting exhibits in support of and in opposition to the motion have been filed by the parties. Lengthy oral argument has been heard in open court. After a careful review of the entire record here, this Court concludes that defendant's motion for summary judgment should be granted as to Counts I, II and IV of the complaint, but denied in all other respects, except that this Court will not at this time rule on Count V of the counterclaim. This

Court is satisfied that the essential dispute here has no antitrust or tort overtones but can be resolved by resort to principles of contract law. Plaintiff's attempt to interject into this litigation the Sherman Act, the Robinson-Patman Act and the Maryland law of unfair competition must accordingly fail. However, material issues of fact exist as to Count III of the complaint and as to Counts I, II, III and IV of the counterclaim. These issues cannot be decided on a motion filed under Rule 56, F.R.Civ.P.

This Court is mindful that "summary procedures should be used sparingly in complex antitrust litigation." *Poller v. Columbia Broadcasting*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 17 L.Ed.2d 458 (1962). However, Rule 56 does not "permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations * * *." *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). Rather, the Supreme Court stated in *First National Bank of Arizona, supra* at 290, 88 S.Ct. at 1593:

> While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

As previously noted, this case has been pending in this Court for over three years, and the parties have undertaken extensive discovery. Interrogatories were first filed by plaintiff in June of 1975, and additional interrogatories and a request for production of documents were filed by plaintiff in July of 1975. Although discovery was suspended for several months in 1976 during unsuccessful settlement negotiations, active dis-

---

3. A hearing on this motion has been postponed until a decision has been rendered on the pending motion for summary judgment.

4. Briefs alone total 428 pages.

covery was resumed in the fall of that year. ULD has been able to obtain a tremendous amount of information by way of discovery, as indicated by the voluminous exhibits attached to the briefs, by the numerous other documents produced, by the answers of UMC to interrogatories and by the many depositions taken of key UMC representatives and others.

After a review of the information produced by this extensive and wide-ranging discovery, it is now apparent to this Court that "this is one of those cases, not unfamiliar in treble damage litigation, where injury resulting from normal business hazards is sought to be made redressable by casting the affair in antitrust terms." *Poller v. Columbia Broadcasting*, 368 U.S. 464, 474, 82 S.Ct. 486, 491, 17 L.Ed.2d 458 (Harlan, J., dissenting); *accord, Diehl & Sons, Inc. v. International Harvester Co.*, 426 F.Supp. 110 (E.D.N.Y.1976); *Frackowiak v. Farmers Insurance Co., Inc.*, 411 F.Supp. 1309, 1319 (D.Kan.1976); *see Aaron E. Levine & Co., Inc. v. Calkraft Paper Co.*, 429 F.Supp. 1039 (E.D.Mich.1976). This is no more than a contract dispute between a manufacturer and a distributor concerning the extent and meaning of an unwritten, thirty-year old distributorship agreement. If at the trial of this case the plaintiff is able to prove its contract claims, full relief will be obtainable for the injuries sustained. Plaintiff's antitrust allegations are no more than window dressing, apparently included to provide leverage for plaintiff's position and to delay final resolution of this dispute.

In opposing summary judgment, ULD has contended as to all of the issues presented that there are disputed questions of fact which cannot be resolved by way of a Rule 56 motion. Although many subsidiary facts pertaining to the antitrust issues in this case are indeed disputed, the material facts necessary for deciding the questions

of antitrust law presented are not the subject of dispute on the present record. *See* Rule 56(c), F.R.Civ.P. Thus, summary judgment is appropriate here as to the antitrust issues.

## The facts

Inasmuch as the terms of the 1947 oral agreement were never reduced to writing, the relationship of the parties over the years, and more particularly in recent years, must be considered. Whatever else the record here may disclose, it underscores the serious problems of interpretation which might be expected to arise when a profitable business relationship is based on a longstanding oral agreement between the parties. The disputed items are numerous and have been increasing since 1970. Questions which have arisen under the agreement include, *inter alia*, the following: whether ULD was the exclusive distributor in the five state area for sales to original equipment manufacturers (hereinafter "OEMs")[5] or only for sales to jobber-distributors (hereinafter "JDs");[6] whether ULD was entitled to UMC's price at the time of order or its price at the time of shipment; whether UMC had an obligation to allow discounts on ULD's OEM sales; whether ULD had a right to purchase from UMC and resell new ballast products such as the new H.I.D. ballast;[7] and even whether ULD had the right to receive free packaging boxes from UMC. As noted hereinafter, it is not possible to decide these questions on a motion for summary judgment. But to determine whether this case presents triable antitrust issues, it will be necessary to examine the relationship between the parties in some detail. Unless otherwise indicated, only facts as to which there is no dispute have been included, since at this stage of these proceedings, the inquiry is being made under Rule 56.

---

**5.** Original equipment manufacturers (OEMs) are essentially companies that sell fluorescent fixtures. They either manufacture the fixture bodies or purchase them from others.

**6.** Jobber-distributors (JDs) are distributors or wholesalers who resell ballasts to electrical contractors, industrial accounts and retailers

(such as hardware stores, discount houses and others) at prices which they decide to charge.

**7.** The H.I.D. ballast was a newly-developed product which was not in existence at the time the 1947 agreement was entered into.

Following the death of UMC's president in November 1968, there was a nationwide shortage of ballasts which lasted until some time in 1970. During this period, problems arose between the parties concerning UMC's alleged failure to supply the needs of ULD. On April 18, 1969, Hyman and Paul Bernstein, the president and secretary of ULD respectively, visited Paul Einhorn, the president of UMC, and presented him with a list of unfilled orders totaling over $515,000. According to ULD, it normally has $150,000 to $200,000 worth of ballasts on order at any one time. According to UMC, ULD's representatives at the 1969 meeting claimed "immediate needs" of only some $170,000. During 1969, UMC sales to ULD increased 18.4% over 1968 sales, while UMC sales to all its customers increased 12.6% over 1968.

On April 24, 1970, Hyman, Paul and Gerald Bernstein[8] of ULD met with UMC's Paul Einhorn and Milton Nathanson[9] in Laurel, Maryland, again with reference to the continuing supply problem. On October 6, 1970, a second meeting was held. According to ULD, at the first meeting, the Bernsteins were advised that UMC would continue to supply them with ballasts as either an OEM or as a territorial distributor, but not as both. At the time, Mobern (which like ULD was controlled by the Bernsteins) was operating as an OEM and ULD was operating as a territorial distributor. The UMC officers took the position that the Bernsteins could not fully promote UMC ballast sales if they were simultaneously promoting Mobern fixture sales.[10] The dispute could not be resolved at either meeting. Subsequently, however, on May 3, 1971, Paul Bernstein advised that the Bernsteins would sell ULD to UMC for $3,200,000. The offer was not accepted.

In May and July of 1971, the Bernsteins telephoned UMC to complain about prices charged by UMC on certain specific ballast items and followed up the complaint by discontinuing the purchase of those items. In that same year, UMC unilaterally reduced from 5% to 2½% the discount allowed by UMC on ULD's purchases of ballasts, and ULD then stopped sending monthly sales reports to UMC.

Sometime in 1971, the Bernsteins also began to complain that UMC itself was making direct sales to OEMs in ULD's exclusive five state area. UMC, from August 1965 to October 1972, had indeed been making substantial direct sales to the Petelco Division of Pyle-National in Aiken, South Carolina. UMC had also commenced direct sales to Southeast Lighting in Charlotte, North Carolina in November 1968, to Sylvania GTE in Reidsville, North Carolina in January 1970, to Colite Industries in West Columbia, South Carolina since January 1970, to Tubelite Co. in Charlotte, North Carolina since the early 1960's, and periodically to several other small accounts. These OEM customers had never purchased ballasts from ULD.

On October 19, 1971, the Bernsteins again met with UMC officers Einhorn, Nathanson and Schwartz. ULD complained about the high prices of certain UMC ballasts, about UMC direct sales to OEMs in the five state area, and about UMC's unilateral reduction of ULD's 5% discount. UMC in turn sought sales reports from ULD. None of the major problems were resolved at this meeting, but certain price reductions were agreed upon.

Westinghouse Supply Company (hereinafter "Wesco") is a large national customer of UMC, and Wesco branches are located throughout the United States. In 1971, Wesco branches in North and South Carolina complained to their regional office in Atlanta, Georgia about poor service from ULD. Beginning in November 1971, Wesco in Atlanta placed orders with UMC for delivery to Wesco branches in the five state

---

8. Vice President of ULD and President of Mobern.

9. Vice President for Marketing of UMC.

10. UMC claims that this conversation occurred at the October rather than the April meeting, a fact which is not material here.

area.[11] On November 15, 1971, Hyman Bernstein complained about UMC sales to Wesco branches in North Carolina. It was not until several years later that UMC took action on this particular complaint. In late 1974, at UMC's request, Wesco in Atlanta stopped placing orders with UMC for drop shipment into the five state area.

On March 20, 1972, Hyman Bernstein requested an accounting of UMC sales in the five state area since 1971. On March 29, 1972, UMC refused to supply ULD's order for the newly-developed H.I.D. ballasts, claiming that ULD lacked technical competence for the effective marketing of this new product. On April 1, 1972, ULD refused to send its quarterly sales report to UMC.

On June 12, 1972, UMC president Einhorn notified Hyman Bernstein that Wesco branches in the five state area had requested permission to purchase UMC ballasts from Whit-Shaw Co., an independent area sales representative in Atlanta, Georgia, rather than from ULD. Around this same time, UMC vice president Nathanson had authorized Whit-Shaw Co. to service certain accounts in the five state area, such as Holland Supply Co. in Henderson, North Carolina, where ULD was not making regular sales and service calls.

On October 23, 1972, Hyman Bernstein met with A. L. King, assistant manager of Wesco in Atlanta, and William Whitcomb, then president of Whit-Shaw Co. According to the deposition testimony of King and Whitcomb, as well as the handwritten notes of Bernstein, Hyman Bernstein at that time threatened to sue UMC, Wesco and Whit-Shaw. On November 1, 1972, Whitcomb wrote to Nathanson of UMC and informed him of Bernstein's threat. Subsequently, in early December 1972, UMC imposed a $75,-000 credit limitation on ULD's account, seeking to reduce the risk of loss presented by the threatened litigation.

On or about January 18, 1973, officers of ULD and UMC met in Paterson, New Jersey. ULD complained about sales that UMC was making in Wesco and Whit-Shaw

in Atlanta, which were drop-shipped into the five state area. UMC demanded ULD's quarterly sales reports due since April 1, 1972, in order to assess its distributor's performance since that time. In turn, ULD requested price relief, and price concessions were in fact made by UMC.

On March 26, 1973, UMC instructed ULD that ULD's calculation of deductions was incorrect. On April 1, 1973, ULD executed a $250,000 letter of credit to UMC to replace the $75,000 credit limitation previously imposed. The letter of credit expired on May 20, 1974. On November 19, 1973, UMC returned to ULD two orders it had made for ballasts, explaining that with rising costs, UMC could not continue to accept orders for shipment at old prices.

On December 1, 1973, March 4, 1974 and May 6, 1974, UMC, with government approval, increased its prices by between 8% and 10%. Following the last price increase, on May 10, 1974, ULD unilaterally deducted $30,515.66 from a remittance to UMC as an adjustment it claimed to be due for discounts and overcharges since 1970. UMC thereupon informed ULD that no more shipments of ballasts would be made until ULD corrected the May 10, 1974 underpayment. In response, ULD cancelled its letter of credit.

On August 27 and 28, 1974, the parties, with their respective attorneys, met at the offices of ULD's then attorney, Stanley Frosh, in Rockville, Maryland. During the summer of 1974, UMC had shipped no ballasts to ULD. At this meeting, the parties discussed various disputed items, including shipment delays, H.I.D. ballasts, UMC sales in the five state area, deductions, sales reports and prices. The notes and recollections of the participants differ markedly as to the results of this meeting. According to UMC officers as well as ULD's attorney, UMC promised to pay ULD a 15% commission on orders placed by Wesco Atlanta for drop-shipment to Wesco branches in the five state area; ULD promised to pay the deductions made from the May 10, 1974

11. Shipment under such an order is known as a "drop shipment."

remittance and also any underpayments on other invoices covered by May 10 and June 10 remittances; and UMC agreed to ship ULD $200,000 of its 1974 orders at May 1974 prices. In his deposition, Hyman Bernstein denied that any agreement was reached on the 15% commission or the May 10 deductions. Paul Bernstein recalled that a 15% commission was agreed upon but was uncertain about any agreement concerning deductions made from the May 10 remittance.

On November 22, 1974, Einhorn of UMC and Paul Bernstein of ULD met in New York City to continue the August discussions. Einhorn told Bernstein that ULD owed UMC $42,550.54 in charge-backs, minus the 15% commission on UMC sales to Wesco Atlanta, which was $39,725.25, or a net total of $2,825.29. ULD refused to pay that sum, which is now claimed by UMC in Count I of its amended counterclaim.

In its December 12, 1974, remittance, ULD again underpaid current invoices in the amount of $4,436.03. On December 18, Paul Bernstein of ULD placed two orders with Einhorn of UMC, which orders were termed "Paul 1" and "Paul 2." According to Einhorn's affidavit, Paul Bernstein agreed that these orders (intended as a regrouping of 1974 orders) would be dated December 18, 1974 and would be paid at current prices. Paul Bernstein could not recall whether he reached an agreement with Einhorn to pay current prices for "Paul 1" and "Paul 2." However, on February 11, 1975, Hyman Bernstein wrote UMC that ULD would never pay current prices on old orders, and ULD subsequently paid old prices for "Paul 1" and "Paul 2." The underpayment on these two orders amounted to $13,318.38 and is claimed by UMC in Count II of its amended counterclaim.

On January 3, 1975, UMC again demanded payment of the $2,825.29 claimed at the November meeting. In a January 10, 1975 remittance, ULD again underpaid current invoices in the amount of $3,737.89. On January 31, 1975, UMC demanded remittance of the underpayments made on De-

cember 12 and January 10. On March 2, 1975 and on April 10, 1975, ULD once again underpaid current invoices by another $11,240.32. This sum is claimed by UMC in Count III of its amended counterclaim.

This suit was filed by ULD on February 28, 1975, and UMC promptly halted all shipments to ULD. During the pendency of this action, shipments have been resumed pursuant to a stipulation between the parties. However, UMC has sought to be relieved of the stipulation and has notified ULD of its intention to terminate the distributorship as soon as the Court will permit.

What the facts here disclose is a continuously escalating conflict between a distributor and a manufacturer as to the unwritten terms of an agreement between them. Retaliatory action on one side has led to similar action on the other, until the relationship between the parties became unbearable.

In filing this suit, ULD has sought to fit the facts into various theories of antitrust law. Indeed, the complaint here contains a laundry list of claimed antitrust violations, including four different Sherman Act violations and one Robinson-Patman Act violation. But analysis of the essential facts here indicates that no amount of legal legerdemain can convert what is basically a contract case into an action maintainable under the federal antitrust laws.

*The Robinson-Patman Act claim*

■ In Count II of the complaint, ULD asserts a claim based on the Robinson-Patman Act, 15 U.S.C. § 13(a). Under the applicable provision, it is unlawful for any person engaged in commerce to discriminate in price (1) between different purchasers, (2) of commodities of like grade and quality, (3) where the effect of such discrimination is to substantially lessen competition or tend to create a monopoly, or to injure, destroy or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination. Discriminatory pricing is violative of the Robinson-Patman Act only when it lessens

or tends to prevent competition between customers or between sellers. 15 U.S.C. § 13(a); *e. g., FTC v. Sun Oil Co.,* 371 U.S. 505, 527, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963). Competition between the buyers at disparate prices is essential to a violation of the Act. *M. C. Manufacturing Co., Inc. v. Texas Foundries, Inc.,* 517 F.2d 1059, 1066 (5th Cir. 1975), *cert. denied,* 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976).

Initially, this Court would observe that three years after this claim was first alleged, plaintiff has still not advanced an intelligible theory (nor cited a single case) supporting its assertion that UMC has violated the Robinson-Patman Act. ULD is an exclusive territorial distributor of UMC. It has no competition from any other territorial distributor. Despite extensive discovery, ULD has uncovered no single instance where any alleged competitor of ULD purchases ballasts from UMC at a lower price than does ULD. Thus, plaintiff has not suffered any secondary line injury.

 ULD's basic contention appears to be that UMC's prices to Wesco Atlanta for drop-shipment made to Carolina branches of Wesco and UMC prices to Whit-Shaw Co. of Atlanta for resale to Carolina branches of Wesco were lower than UMC prices to other jobber-distributors, although much higher than UMC prices to plaintiff. If ULD is asserting primary line injury to itself as a "competitor" of UMC, such a theory is untenable. Since a manufacturer, such as UMC, has a natural monopoly in its product, it is under no Robinson-Patman obligation to sell to its distributor at a price sufficiently low to enable the distributor to compete with the manufacturer for customers to whom the manufacturer sells directly. *Guyott Company v. Texaco, Inc.,* 261 F.Supp. 942, 950 (D.Conn.1966). Thus, a manufacturer does not violate the Robinson-Patman Act by selling directly to a customer at a lower price than it sells to its own distributor. *Diehl & Sons, Inc. v. International Harvester Co.,* 426 F.Supp. 110, 123, n. 22 (E.D.N.Y.1976); *Secatore's, Inc. v. Esso Standard Oil Co.,* 171 F.Supp. 665, 667 (D.Mass.1959). *A fortiori,* UMC did not vio-late the Act by·selling at a *higher* price to Wesco. A manufacturer is simply not in competition with its distributor under these circumstances.

 If, on the other hand, ULD is asserting some unarticulated theory of tertiary level injury to jobber-distributors who, unlike ULD, might be competitors of Wesco, ULD has no standing to assert such a speculative claim. ULD has standing to rely only on sales UMC may have made to competitors of ULD at lower prices than ULD receives. *Mayer Paving & Asphalt Co. v. General Dynamics Corp.,* 486 F.2d 763, 770 (7th Cir. 1973), *cert. denied,* 414 U.S. 1146, 94 S.Ct. 899, 39 L.Ed.2d 102 (1974); *accord, M. C. Manufacturing Co., Inc. v. Texas Foundries, Inc., supra* at 1066, n. 15. The record here discloses no such sales.

Accordingly, there is no merit to the claim asserted by ULD under Count II.

### The Sherman Act claims

#### (a) Conspiracy

 In order to sustain a claim of conspiracy in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, plaintiff must establish both (1) a conspiracy, combination or contract, and (2) that such conspiracy, combination or contract is an undue restraint of trade. *House of Materials, Inc. v. Simplicity Pattern Co.,* 298 F.2d 867, 870 (2d Cir. 1962). On the voluminous record before this Court, it is clear that ULD has failed to meet these requirements.

Plaintiff alleges that UMC conspired with its parent Northwest Industries, Inc. to destroy ULD's intrabrand competition in Universal ballasts. Although a parent and its subsidiary in an appropriate case might constitute independent conspirators for § 1 purposes, *see Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951), such is not the case here. There is no evidence in this record to support plaintiff's assertion that Northwest advised UMC in 1970 to refuse to deal with the Bernsteins because they were then acting both as an OEM (through Mobern) and as an exclusive territorial dis-

tributor (through ULD). Nor is there any indication that Northwest imposed or had anything to do with ULD's 1972 credit limitation which was established in response to ULD's threat of suit. Plaintiff's mere assertion is flatly contradicted by defendant's affidavits.

ULD further asserts that Northwest "suggested" the cessation of shipments in 1974 when ULD failed to pay UMC remittances. However, even assuming the truth of such an allegation, this Court "cannot conclude that *such discussions* constitute a combination within the meaning of Section 1 of the Sherman Act or that they represent more than *internal dialogue leading to a decision on the part of a single business unit * * *." Beckman v. Walter Kidde & Co.*, 316 F.Supp. 1321, 1326 (E.D.N.Y. 1970) (emphasis supplied), *aff'd per curiam*, 451 F.2d 593 (2d Cir. 1971), *cert. denied*, 408 U.S. 922, 92 S.Ct. 2488, 33 L.Ed.2d 333 (1972); *Mutual Fund Investors, Inc. v. Putnam Management Co.*, 553 F.2d 620 (9th Cir. 1977); *see also Knutson v. Daily Review, Inc.*, 548 F.2d 795, 801–803 (9th Cir. 1976), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094.

Moreover, there is no conceivable reason why UMC and its parent would conspire to drive ULD out of business. Absent contractual limitations on its right to do so, UMC may at any time unilaterally stop selling to ULD. *Diehl & Sons, Inc. v. International Harvester Co.*, 426 F.Supp. 110, 117 (E.D.N.Y.1976). Accordingly, under the facts in this record, Northwest is not a § 1 co-conspirator. Even as alleged by plaintiff, the actions of Northwest cannot be characterized as "in restraint of trade." *Call Carl, Inc. v. B–P Oil Co.*, 403 F.Supp. 568, 572–3 (D.Md.1975), *aff'd on this ground, rev'd in part on other grounds*, 554 F.2d 623, 628 (4th Cir. 1977).

Plaintiff has also listed numerous other purported co-conspirators in support of its § 1 claim. Such a shotgun approach illustrates the inherent weakness of plaintiff's antitrust claims and furnishes support for this Court's conclusion that plaintiff has done no more than concoct antitrust claims out of what is essentially a contract dispute.

Plaintiff first contends that Whit-Shaw Co. "conspired" with UMC and Wesco branches in the five state area from 1971–1974 to divert Wesco sales from ULD to Whit-Shaw, following Wesco's complaint to UMC that ULD was not adequately servicing its branches. However, no contention is made that, nor is there any evidence that, Whit-Shaw or Wesco brought pressure to bear on UMC to force ULD out of business. *See Beckman v. Walter Kidde and Co., supra* at 1328. Neither Wesco nor Whit-Shaw were even named as defendants in this action.

Moreover, there could be no antitrust violation in any event because any attempt by Whit-Shaw or Wesco to eliminate ULD would be "analogous to one distributor conspiring with a manufacturer to replace an existing distributor, which has been held not to constitute a § 1 violation." *Diehl & Sons, Inc. v. International Harvester Co., supra* at 118. Plaintiff has not cited any authority in support of the proposition that isolated incursions into its exclusive territory are "restraints of trade." Indeed, such incursions would appear to have promoted rather than restrained trade. The record discloses that Wesco branches complained to UMC about the service rendered by ULD and sought alternative sources of ballasts.

ULD's contention that there were many other co-conspirators with UMC is frivolous. This group includes allegedly all national customers of UMC such as Graybar and Noland who order ballasts directly from UMC for shipment to their five state branches, all OEM customers of UMC within the five state area, and even all OEMs who complained that the ULD–Mobern relationship gave Mobern a competitive advantage in promoting its fixtures. For the reasons previously stated, these customers of UMC simply had no antitrust objective. Indeed, under the contrived theory of the case advanced by ULD itself, namely that UMC sought to eliminate ULD's intrabrand "competition", there is neither evidence for nor any logical basis for any finding of joint action taken by UMC *customers* to elimi-

nate purported "competition" which presumably would benefit them. *Diehl & Sons, Inc. v. International Harvester Co., supra* at 119. The actions taken by UMC and challenged by ULD were simply independent business decisions and not the result of any purported "conspiracy" with a customer.

■ Even assuming *arguendo* that a "conspiracy" might have existed between UMC and certain customers, *see generally Industrial Building Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336 (9th Cir. 1970), it cannot be concluded under the facts here that such a conspiracy was "in restraint of trade." Defendant's affidavits, depositions and exhibits establish that UMC sold ballasts only to OEMs in the five state area not serviced by ULD and only to JDs in the five state area in the isolated instances when ULD was not making the sales. Thus, any "conspiracy" that existed inevitably promoted rather than restrained trade.

For these reasons, this Court concludes that there is no merit to the claim asserted in Count I of the complaint that defendants engaged in a conspiracy in violation of § 1 of the Sherman Act.

### (b) *Horizontal price fixing*

In Count I, plaintiff has also alleged horizontal price fixing among UMC, General Electric and Advance Transformer. At oral argument, counsel conceded that discovery had produced "no evidence of overt collusion" but relied on similar price increases made by these three competing manufacturers.

■ It is well settled that conscious parallelism does not establish horizontal price fixing. *E. g., Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 84–85 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); *State of North Carolina v. Chas. Pfizer & Co.*, 384 F.Supp. 265, 283–286 (E.D. N.C.1974), *aff'd*, 537 F.2d 67, 75–76 (4th Cir.), *cert. denied*, 429 U.S. 870, 97 S.Ct. 183, 50 L.Ed.2d 150 (1976). Plaintiff points out that these three alleged price fixers were

members of a trade association, the Certified Ballast Manufacturers Association. However, mere membership in a trade association is no more than a "neutral fact," and plaintiff has uncovered no evidence in discovery which would support even an inference of price communications through the association. *See Bray v. Safeway Stores, Inc.*, 392 F.Supp. 851 (N.D.Cal.1975).

■ ULD also points to purported "price signalling" by advance announcements of price increases and publication in a trade journal, *Trade Service*, relying on certain consent decrees entered in other cases prohibiting such "price signalling." In the absence of more evidence of price fixing than is disclosed by this record, this Court cannot conclude that public or advance announcements of price changes relied upon by plaintiff here amounted to any violation of the antitrust laws.

Affidavits of UMC's principal officers flatly deny that any price discussions were ever conducted with Advance Transformer and General Electric. After extensive discovery, plaintiff has revealed no evidence to the contrary. As to this issue, plaintiff has engaged in a fishing expedition and has returned empty-handed.

Accordingly, summary judgment will be granted as to the allegations in Count I of horizontal price fixing.

### (c) *Vertical price fixing*

■ Plaintiff also contends that UMC engaged in resale price maintenance. It is well established that if an independent distributor unwillingly complies with a manufacturer's suggested or recommended price, he may properly claim that an illegal combination exists under § 1 of the Sherman Act. *See Albrecht v. Herald Co.*, 390 U.S. 145, 150 n. 6, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *United States v. Parke Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *Phillips v. Crown Central Petroleum Co.*, 395 F.Supp. 735, 760 (D.Md.1975). But the facts support no such claim here.

■ ULD argues that it agreed to adhere to UMC's "pricing policies" setting

higher prices for JDs in the replacement market than for OEMs in the fixture market. However, ULD willingly complied with this suggested price scheme because ULD profited when it purchased ballasts from UMC at OEM prices and resold them at the higher JD prices, less any discounts which ULD chose to give. Thus, the purported agreement between UMC and ULD was based upon no more than ULD's "individual self interest to bring about general voluntary acquiescence." *United States v. Parke Davis & Co., supra* 362 U.S. at 46–47, 80 S.Ct. at 513. In the absence of coercion, ULD's voluntary adherence to UMC's pricing policies does not give rise to a claim under the antitrust laws. *E. g., Knutson v. Daily Review, Inc., supra* at 806; *Butera v. Sun Oil Co.*, 496 F.2d 434, 437 (1st Cir. 1974); *Phillips v. Crown Central Petroleum Co., supra* at 760.

ULD has not been able to show by affidavits, by ULD records or by UMC documents a single instance when UMC ever sought to ascertain ULD's resale prices to specific customers, when UMC ever recommended specific prices to specific customers, or when UMC ever attempted to coerce compliance with suggested prices. On the contrary, the deposition testimony of plaintiff's own officers establishes that ULD exercises pricing independence and does not communicate its prices to UMC. Similarly, the deposition testimony of UMC's principal officers establishes that UMC does not even know what resale prices are charged by ULD. Like so many other claims asserted here by ULD, there is simply no factual support for the assertion of an antitrust violation.

The fact that UMC circulated Universal ballast price sheets is likewise without significance. "Where a seller merely publicizes its desired prices, seeks to facilitate them by literature supplied its dealers, and makes its wishes known, it has not engaged in coercion; the Sherman Act does not prohibit a seller from taking these normal business steps to maintain suggested resale prices." *Newberry v. Washington Post Co.*,

438 F.Supp. 470, 479 (D.D.C.1977). UMC did no more than circulate these price sheets, and at times ULD gave discounts from the prices listed. These facts indicate that there was no coercion here.

Finally, ULD's claim that "indirect" resale price maintenance existed here is completely without merit. ULD contends that the pricing arrangements which UMC had with Graybar, Wesco and the Southern Independent Electrical Distributors ("SIED"), each with branches in the five state area, resulted in setting an upper limit on prices which ULD could charge. Certainly, if Graybar, Wesco and SIED branches *outside* the five state area received lower prices from UMC than branches inside the area, the latter would be expected to seek similar price concessions from ULD. This is not resale price maintenance, but rather the free functioning of a national marketplace. It is likewise true that customers in the five state area who purchase H.I.D. ballast directly from UMC [12] might seek discounts on other ballasts purchased from ULD similar to the UMC discounts on H.I.D. ballasts. But again, this is not resale price maintenance, but the operation of normal competitive factors. ULD is free to adjust or refuse to adjust its discounts, as it deems appropriate under all the competitive circumstances.

Accordingly, this Court is satisfied that plaintiff can point to no evidence in this record to support the allegations of resale price maintenance contained in Count I of the complaint.

### (d) *Monopolization and attempted monopolization*

A manufacturer is generally free to control the method of distribution of its products and to replace a distributor with an agency system. *E. g., Knutson v. Daily Review, Inc., supra; Newberry v. Washington Post Co., supra* at 484; *Diehl & Sons, Inc. v. International Harvester Co., supra* at 119. ULD bases its monopolization claims under § 2 of the Sherman Act on the

---

**12.** UMC does not now sell the newly-developed H.I.D. ballast to ULD.

premise that ULD and UMC are "competitors" and that therefore ULD's distributorship can never be terminated. On the record here, this Court concludes that ULD's factual premise is erroneous, and that its legal conclusion lacks merit.

If UMC and ULD were found to be competitors, the relevant product market here would be the replacement market for all ballasts. Although ULD asserts merely that there is a "general tendency and preference to replace Universal ballasts with the same brand," the record here indicates that UMC, Advance Transformer and General Electric each produce interchangeable ballasts with a cross-reference guide for the replacement of other manufacturers' ballasts. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *Liggett & Myers, Inc., v. FTC*, 567 F.2d 1273, 1274–75 (4th Cir. 1977). If competition existed, the relevant geographic market in this case would be the five state area in which plaintiff conducts its distributorship business. *See Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); *Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 988–989 (D.C.C.1977).

■■■ At the outset it must be emphasized that UMC is a manufacturer and ULD is a territorial distributor. In the OEM or fixtures market, ULD has only four territorial customers of long standing (including Mobern) to whom UMC has never sold ballasts. Except for these four customers, ULD has never sold or solicited any OEM accounts in the five state area. UMC has been selling ballasts directly to OEMs in the five state area since 1965, but these OEMs have never been customers of ULD. Moreover, it is highly unlikely that any OEM, apart from ULD's four customers, would buy from ULD rather than from a manufacturer because an OEM would not want to place an order through a distributor like ULD which is so closely associated with an OEM competitor like Mobern. Thus, plaintiff cannot show any actual competition or even a likelihood of potential competition between UMC and ULD in the OEM market.[13] Whether or not UMC sales to OEMs violate the 1947 oral agreement, it is clear that these sales cannot form the basis for any antitrust claim of monopolization asserted by ULD.

ULD contends that UMC is also a "competitor" in sales to JDs in the five state area. UMC replies that it has made isolated sales in the five state area only when ULD was not making sales or when ULD was not properly servicing the business. Analysis of the specific sales relied upon by plaintiff indicates that ULD and UMC cannot, because of sales each has made to JDs in the area, be considered "competitors" for the purpose of a claim asserted under § 2 of the Sherman Act.

First of all, UMC did not compete with ULD for the business of Wesco's Carolina branches. Wesco Atlanta is the regional headquarters of Wesco in the Southeast and had been a customer of UMC for several years prior to 1971. In 1971, Wesco branches in North and South Carolina complained to Wesco Atlanta about poor service from ULD. Reacting to these complaints from its branches, Wesco Atlanta placed orders with UMC for drop shipment into the Carolina branches. Inasmuch as the order originated outside ULD's five state territory, UMC filled the order. At UMC's request made in 1974, following the many charges and counter-charges of breach of contract mentioned hereinabove, Wesco Atlanta stopped placing orders with UMC for drop shipment into the five state area.[14] UMC's dealings during this period with Wesco Atlanta hardly amount to actions taken by a

**13.** ULD's suggestion that UMC precluded ULD sales to OEMs in violation of *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967) as modified by *Continental T. V. v. GTE Sylvania*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) is without foundation. UMC has done no more than merely refuse to recognize ULD's asserted exclusivity over these sales. In any event, ULD has not shown that it even solicits new OEM accounts.

**14.** The drop shipments totalled $246,565.91 from 1971 to 1975.

"competitor". Rather, UMC was seeking to promote its own business as a manufacturer when it permitted the drop-shipment sales in question and later stopped them when ULD claimed that the distributorship agreement was being violated.

In 1970–1974, UMC also made a few isolated direct sales to Wesco branches in the Carolinas.[15] The largest of these involved a sale to Wesco Raleigh in 1971, amounting to $26,985, following a specific request by Wesco Raleigh in connection with its fulfilling a state contract. Sales to other Wesco branches in 1971 totalled $19,610. Total direct sales to Wesco branches in the five state area were $2,494 in 1972, $705 in 1973, $1,846 in 1974, $262 in 1975, and $403 in 1976. These figures hardly indicate any attempt on UMC's part to compete with ULD in the area involved.

In 1967–1972, UMC also made isolated sales to Graybar branches in the five state area. The largest of these sales was to Graybar Richmond in 1970 and amounted to $8,436. This sale was made to the Graybar branch when it complained to UMC that ULD was not cooperating with Graybar in giving quotations upon which it could bid on government contracts. In 1972, UMC turned this particular account over to ULD. From 1965 to 1976, UMC also serviced Graybar Asheville, because the branch manager complained about ULD service. Like many others relied on by ULD, these sales were de minimis, ranging from a high of $526 in 1966 to a low of $97 in 1976. Plaintiff has apparently had very little interest in Graybar as a customer. ULD has sold very few ballasts to Graybar branches and has not even included Graybar as a customer in the five state area on the replacement list it distributes to retailers.

From 1969 to 1971, UMC also made direct sales totalling $10,820 to Eastern Sales & Engineering in Baltimore, Maryland, after ULD was unwilling to do so. At ULD's request, UMC later returned this account to ULD.

From 1973 to 1975, UMC sold ballasts to Southern Independent Electrical Distributors (hereinafter "SIED"), a buying organization located outside the five state area in Atlanta. Although these were sales made outside ULD's area, for the convenience of its customer, UMC drop-shipped the goods to certain SIED members in the five state area, such as Bryant Supply, Inc., Cameron & Barkley and Capitol Electric.

Other isolated sales were similar in nature. At the specific request of Maurice Electric Supply, located in Washington, D.C., UMC in 1971 sold ballasts to Maurice amounting to $6,185 for drop shipment to a specific customer in the five state area. In 1976, UMC made sales of $87,304 to Maurice for shipment to Kenbert Lighting in New Jersey. Actually, this was a sale directly to the OEM Kenbert, which had an obligation to deliver fixtures to Maurice. Since Kenbert was in bankruptcy, UMC refused to sell to it, and arrangements were made for Maurice to purchase the ballasts.

Plaintiff relies heavily on its Exhibit K which purports to list all UMC sales to JDs in the five state area. However, this list is inaccurate in numerous respects. Imperial Reading Corporation is a manufacturing company and subsidiary of Northwest Industries, one of the defendants; it is not a jobber-distributor. The Noland Co. is a national chain with its billing headquarters in Newport News, Virginia. Thus, UMC invoices to Noland in Virginia actually cover sales to its branches outside the five state area. Holland Supply Co. is a customer with which ULD refused to deal in 1972. Later, in 1974, this account was turned over to ULD for servicing. Moreover, some of the sales included in Exhibit K are in fact UMC's replacement of defective ballasts previously sold by ULD, pursuant to UMC's manufacturer's warranty. Other sales are those of H.I.D. ballasts, which are not even handled by ULD.

ULD contends that the "competition" between ULD and UMC was not de minimis

---

15. Defendant's Exhibit D and Plaintiff's Exhibit K are the sources for all statistics. Where variations exist, plaintiff's figures are used, except where clearly shown to have been inaccurate.

and has suggested a figure of some $6 million in purported UMC sales to "distributors, manufacturers and other end user customers" in the five state area from 1971 to 1976, which sales "might" have been made by ULD. This figure is grossly exaggerated. First, the figure includes approximately $5,038,117 of UMC sales to OEMs in the five state area. As previously noted, ULD has never sold to these accounts nor even solicited these accounts. Indeed, in ULD's entire history, it has apparently sold to only four OEM accounts, including its own affiliate Mobern. There is simply no support in the record here for ULD's claim that it has been "competing" with UMC insofar as the OEM market is concerned.

ULD's inaccurate figures also include drop shipments to Wesco branches in the amount of $246,565.91 during the five years in question. As noted, these sales were actually made to Wesco Atlanta outside the five state area. UMC was not "competing" with ULD for this business. The regional office of this major national customer of UMC had requested shipments in this manner after its regional branches complained about ULD service. This Court is satisfied that under the circumstances here, drop shipment sales made by Graybar Atlanta did not amount, as a matter of law, to "competition" with ULD for the purpose of the assertion of a claim of monopolization. Whether or not these sales amounted to a breach of the agreement between the parties is a question not decided here.

At most, plaintiff might legitimately complain only about direct UMC sales to JDs in the five state area during the relevant period. But these sales were de minimis. In 1971, UMC sold only $62,241 worth of ballasts to five state area JDs, including the previously mentioned sales of $13,134 to Eastern Sales and Engineering and of $26,985 to Wesco Raleigh. In 1971, ULD had total sales of $1,071,982.[16] In 1972, UMC sales of this sort were $11,004, including a sale of $4,998 to Graybar Richmond before that account was turned over to ULD. ULD's total sales in that year were $1,130,551. In 1973, UMC sold $13,099 in the area, including the previously mentioned sale of $5,891 to Holland Supply. In that year, ULD's total sales were $1,243,515. In 1974, UMC sold $12,885 in the area, including $5,961 to Holland Supply, while ULD's total sales were $1,035,943.[17] In 1975, UMC sold $262 to Wesco branches, including $41 in H.I.D. ballasts, while ULD's total sales were $1,190,336.

Moreover, a comparison of UMC sales with ULD sales in the five state area further supports this Court's finding that purported "competition" between the parties was de minimis. UMC sales to JDs in the five state area equaled 5.8% of ULD sales in 1971; 0.9% in 1972; 1.1% in 1973; 1.2% in 1974 and 0.02% in 1975. If these figures are adjusted to exclude those specific sales as to which no possible claim of competition might be made, the results are even more revealing. UMC sales would then equal 2.1% of ULD sales in 1971; 0.5% in 1972; 0.6% in 1973; 0.7% in 1974 and 0.02% in 1975. Whether or not some or all of these UMC sales in the area would violate the terms of the 1947 oral agreement, it is apparent that UMC is not in "competition" with its distributor under § 2 of the Sherman Act. The cases relied upon by plaintiff involved situations in which a distributorship had been eliminated because of the unfair diversion of *most* of its *important* customers. *E. g., Industrial Bldg. Materials, Inc. v. Interchemical Corp., supra; Poster Exchange, Inc. v. National Screen Service Corp.*, 431 F.2d 334 (5th Cir. 1970). But here the UMC sales relied upon by ULD are quite clearly insufficient to support a § 2 claim. This Court has not been referred to any case which has held that isolated sales by a manufacturer of the type made here in the exclusive territory of its distributor are grounds for the assertion of

16. ULD's sales figures are taken from plaintiff's Memorandum at p. 51. No adjustment was made for Wesco Atlanta sales.

17. The decline in total sales in 1974 is explained by UMC's refusal during the summer of 1974 to supply any more ballasts until ULD paid for previous orders.

a Sherman Act claim. Even these *de minimis* sales were reduced during the 1971 to 1975 period, a fact which belies any intention on the part of UMC to monopolize.

Plaintiff has also contended that UMC has acted to destroy ULD's purported "intrabrand competition". Again, there is no factual support for this claim. Of primary significance here is the fact that during the lengthy and involved disputes between the parties occurring between 1971 and 1976, UMC did *not* terminate or attempt to terminate plaintiff's distributorship. Indeed, it was not until March 18, 1977, two years after UMC had been sued, that UMC formally notified ULD that the distributorship would be finally terminated. Thus, this is not a case involving the termination of a distributorship for reasons not permitted by the antitrust laws. *Cf. Industrial Building Materials, Inc. v. Interchemical Corp., supra; Poster Exchange, Inc. v. National Screen Service Corp.,* 431 F.2d 334 (5th Cir. 1970); *Phillips v. Crown Central Petroleum Co., supra.*

Other facts likewise contradict plaintiff's assertion of an anticompetitive intent on the part of UMC, including the frequent negotiations between the parties during the years in question, the numerous concessions made by UMC during this period and the settlement of many of the differences that existed. Rather than attempting to destroy ULD, UMC persistently sought to continue the profitable relationship and patch up the differences that existed. Finally, the business relationship deteriorated to the point where conditions became intolerable, and this litigation ensued.

On April 18, 1969, discussions were had between the Bernsteins and UMC officers to expedite the shipment of ULD's immediate needs. On October 19, 1971, the parties met, and UMC granted price concessions to ULD. On January 18, 1973, the parties again met, and UMC granted more price concessions to ULD. On August 27 and 28, 1974, the parties met in an attempt to resolve the many outstanding differences that had then arisen. On that occasion, UMC offered to pay ULD a 15% commission on all Wesco Atlanta orders drop shipped into the five state area and to resume ballast shipments to ULD if ULD would remit certain payments claimed to be due on past and future invoices. Not only did UMC officers believe that an accord and satisfaction had been reached on that occasion, but ULD's own lawyer was of a similar view. Whether or not there was a meeting of the minds at the time, the facts belie any claim of anticompetitive intent on the part of UMC.

As mentioned, UMC during this period made isolated sales in the five state area to JDs whom it believed at the time were not being adequately serviced by ULD. UMC's lack of an anticompetitive motive is shown by the fact that it turned many of these customers over to ULD. At UMC's request in 1974, Wesco in Atlanta stopped the placement of orders for drop shipment to Wesco Carolina branches which had been dissatisfied with ULD. In 1972, UMC turned the Graybar Richmond account over to ULD, despite prior complaints about ULD's performance in 1970 by this customer. UMC made sales to Eastern Sales and Engineering from 1969 to 1971 and then turned the account over to ULD. Holland Supply Co. had been rejected by ULD as a potential customer in 1972. After UMC direct sales to Holland increased, ULD requested and received the return of the account to it.

While ULD contends that there were fifteen examples of "predatory tactics" undertaken by UMC, the events in question relate only to three areas of dispute: shipment and remittance problems, the "exclusivity" problem, and UMC's refusal to sell H.I.D. ballasts. But all of these disputes arose because of the parties' different interpretations as to the application of the 1947 oral agreement to new circumstances which could hardly have been contemplated some twenty-five years before. In a situation such as the one involved here, where each party relies in good faith on its understanding of the contract, there simply is no legitimate antitrust claim. *Cf. Knutson v. Daily Review, Inc., supra* at 803.

The right of a distributor to be free from "unfair competition" on the part of a manufacturer is not a novel question, *Industrial Building Materials, Inc. v. Interchemical Corp., supra* at 1341. The *Industrial* case, relied upon heavily by ULD, was recently distinguished by the same court in *Knutson v. Daily Review, supra* at 803. The Ninth Circuit in *Knutson* stated that *Industrial* held merely that the "elimination of a competitor can be an unreasonable restraint when either (a) 'unfair' predatory methods are used *to force out the competitor*, or (b) there is a market structure in which loss of a distributor will enhance a manufacturer's market power *and tend to diminish the ability of other manufacturers to compete*." (Emphasis supplied). *Id.* at 803. In this case, plaintiff has failed to satisfy either of these requirements.

This Court has already held that *de minimis* sales by UMC into the five state area did not make ULD a "competitor" of UMC. Moreover, the facts here are quite different from those in *Industrial*. In that case, the manufacturer had lured away from the distributor its top salesman by offering a higher salary and also lured away *all* of the distributor's important customers by offering lower prices. Here, ULD's sales and profits remained high throughout the period,[18] incursions into its territory were isolated, many customer accounts were turned over to it by UMC, and none of ULD's customers received lower prices from UMC than were offered by ULD. In this case then, there were no predatory tactics and no attempt to force the customer out of business. Rather, the difficulties that arose were the result of contract disputes between the parties.

Relying on *dicta* in the *Industrial* opinion at 1342–43, ULD contends that any action taken by UMC in the five state area, including direct sales to OEM or JD customers or the termination of ULD, would inevitably strengthen UMC's dominant position in the ballast market and would therefore constitute an unreasonable restraint of trade.[19] But ULD misconstrues the import of the language used by the Ninth Circuit in *Industrial*. If plaintiff's contention were accepted, "a manufacturer could be prevented 'from ever replacing a system of independent distributors with its own system of direct sales,' a result that even *Industrial* did not endorse." *Knutson v. Daily Review, Inc., supra* at 803. The proper test to be applied here is whether UMC's actions had any *horizontal* anticompetitive effect on its competitors Advance Transformer and General Electric. Plaintiff can point to no such evidence but relies entirely upon the purported *vertical* anticompetitive effect of UMC's actions on intrabrand competition. However, a "termination is not unlawful because of some adverse effect on the distributor's business, even if the effect is the elimination of the distributor from the market. The complaining distributor must show that the refusal to deal was intended to or did bring about some restraint of trade beyond the loss of business suffered by the distributor or the market's loss of a distributor-competitor." *E. g., Knutson v. Daily Review, Inc., supra* at 803; *Bushie v. Stenocord Corp.*, 460 F.2d 116, 119 (9th Cir. 1972). UMC's actions here, which were much less drastic than termination and which merely had the consequence of a possible loss of a small amount of business by ULD, did not violate the antitrust laws.

The other cases relied upon by plaintiff are also not in point. *United States v. Klearfax Linen Looms*, 63 F.Supp. 32 (D.Minn.1945), involved a distributor which undercut a manufacturer in a successful bid for a government contract and a manufacturer which subsequently attempted to coerce the distributor into withdrawing its

---

**18.** Counsel have been advised of the Court's findings concerning sales and net profits of ULD for the five years before suit was filed. These figures will not be included as a part of the published opinion.

**19.** In view of this Court's approach to the issue of monopolization, it is not necessary to consider UMC's share of the relevant product market. Figures are not available concerning UMC's share of the replacement market in the five state area, although its share of the overall, national market was 42.8% in 1976.

successful bid. Ultimately, the manufacturer flatly refused to fill the distributor's order for the material necessary to fulfill the government contract. Here, ULD can point to no instance where it underbid UMC on a specific contract and where UMC retaliated by refusing to ship goods to fill that specific order.

*Poster Exchange, Inc. v. National Screen Service Corp.*, 431 F.2d 334 (5th Cir. 1970) did not involve an antitrust claim by a distributor against a manufacturer. There, a national distributor during a five-year period charged "top prices" and gradually reduced its shipments to a local distributor to nothing. Here, ULD was not charged the "top prices", ULD continued to receive ballasts, except when shipments were temporarily halted on two occasions in 1974 and 1975 because of ULD's failure to pay UMC, and ULD sales and profits remained high during the entire period.

ULD asserts that UMC purposely delayed shipments of ballasts to plaintiff. However, ULD has not denied statements contained in defendants' affidavits which establish that the time period involved was one of a nationwide shortage of ballasts followed by a period of rapidly increasing prices. Nor does ULD deny that its practice was to place large orders with UMC shortly before previously announced dates for price increases in order to avoid the price increase. Other delays were similarly not the result of any anticompetitive intent on UMC's part. There were delays when UMC imposed a credit limitation of $75,000 in December 1972 following the threat of a suit by Hyman Bernstein. In May and August of 1974, UMC temporarily halted shipments to ULD when the latter refused to pay for previous orders.

From a review of all the evidence, including plaintiff's reply affidavit submitted at the hearing,[20] this Court concludes that, unlike the defendants in *Klearfax Linen Looms* and *National Screen Service Corp.*, UMC did not attempt to drive plaintiff out

of business by repeated refusals to deal with its distributor. Whether or not delays in shipments here were a breach of the 1947 oral agreement, they did not result in any violation by UMC of the antitrust laws.

For these reasons, this Court is satisfied that plaintiff's claims in Count I of monopolization and attempted monopolization on the part of UMC are without merit. Not only are ULD and UMC not "competitors", but also UMC did not employ unfair tactics in an attempt to drive ULD out of business.

### The contract claim

Count III of the complaint alleges a breach of contract. Little discussion is necessary to set forth the Court's reasons for denying defendants' motion for summary judgment as to Count III.

The contract in question was a 1947 oral agreement which was never reduced to writing. Quite obviously, summary judgment under Rule 56 is hardly appropriate when the parties cannot agree as to the terms of an oral agreement entered into many years ago. Moreover, many of the disputed questions of fact have arisen as a result of differing interpretations of events occurring since 1970. Thus, insofar as plaintiff's contract claim is concerned, the present record discloses many genuine issues of material fact which cannot be resolved under Rule 56.

UMC's defense of waiver, asserted under Md.Code Ann., Com.Law § 2–607(3)(a), likewise raises issues which cannot be decided at this time. One of the questions presented is whether notice of breach of contract was given by ULD "within a reasonable time." Exploration of the underlying facts is necessary as to the issue of waiver as well.

Accordingly, defendants' motion for summary judgment will be denied as to Count III.

---

**20.** At the hearing, plaintiff submitted a reply affidavit of Hyman S. Bernstein with exhibits. This affidavit was timely under Rule 56, and defendants' oral motion to strike the affidavit will be denied.

### The common law tort claim

Count IV of the complaint is based on the Maryland law of unfair competition. ULD claims that UMC engaged in a campaign of unfair competition and used predatory tactics to cause injury to ULD. The same arguments are advanced by ULD in support of this claim as were made in support of ULD's federal antitrust claims. Indeed, in asking this Court to uphold its Count IV claim, ULD specifically refers the Court to those portions of its brief which discuss ULD's antitrust claims.

■ For the reasons previously stated, ULD cannot in this action maintain a claim of unfair competition against UMC. As the record here discloses, the parties were not competitors, and UMC did not engage in predatory practices seeking to injure the business of its distributor. As fully discussed herein, the disputes between the parties were contract disputes and arose because the parties had conflicting interpretations of the terms of the oral agreement and the manner in which each side was required to perform. The acts undertaken by UMC during the period in question were in furtherance of its understanding of the agreement between the parties and were not intended to eliminate a competitor or otherwise injure the business of ULD.

For these reasons, summary judgment will be granted as to Count IV.

### The counterclaim

Counts I, II and III of defendants' counterclaim raise questions closely related to plaintiff's claim of breach of contract. For the reasons previously stated in support of this Court's conclusion that summary judgment cannot be granted as to Count III of the complaint, the questions arising under these three Counts of the counterclaim also cannot be resolved under Rule 56.

Disputes exist as to the agreements themselves and as to the parties' calculations concerning remittances. There are therefore material issues of fact as to these various disputes.

■ In Count IV of its counterclaim, UMC seeks a declaratory judgment to the effect that it has grounds to terminate ULD's distributorship for cause. The "causes" alleged by UMC include the failure of ULD to honor the August 1974 accord and satisfaction, the failure of ULD to pay invoices, the failure of ULD to provide sales reports, and the initiation of this lawsuit. Inasmuch as the facts relating to the accord and satisfaction, to the calculation of invoice prices and to the disclosure of sales reports are hotly contested, summary judgment cannot at this time be entered under Count IV of the counterclaim in favor of UMC.

Relying on § 2–309(2) and (3) of the Uniform Commercial Code, UMC contends in Count V of its counterclaim that it has the right to terminate its agreement with ULD upon reasonable notice and that it has in fact given ULD such reasonable notice. A declaratory judgment to such effect is sought. This Court will not undertake to decide this question at the present time, but will reserve ruling on the requested declaratory judgment until later in these proceedings.

UMC is presently supplying ballasts to ULD under a stipulation approved by this Court on October 22, 1975. Under this stipulation, UMC is required to continue to sell to ULD until this litigation and any appeal have been concluded. Presently before the Court is a motion filed by UMC asking to be relieved of this stipulation and seeking approval of its request to halt any further shipments of ballasts to ULD. A hearing on that motion has not been scheduled, pending a decision on defendants' motion for summary judgment.

The question whether UMC has the right to terminate its agreement with ULD upon reasonable notice is closely related to the question whether UMC has a right to be relieved of the stipulation so that it can halt shipments of ballasts at once. The scheduling of further proceedings in connection with these issues will be deferred until the Court has had an opportunity to confer with counsel.

*Conclusion*

For the reasons stated, defendants' motion for summary judgment will be granted as to Counts I, II and IV of the complaint, but denied as to Count III of the complaint. Defendants' motion for summary judgment will be denied as to Counts I, II, III and IV of the counterclaim. A ruling as to Count V of the counterclaim will be deferred until later.

An appropriate Order will be entered by the Court.